**Terry PENNYCUFF, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A02–9902–CR–117.**

Court of Appeals of Indiana.

April 26, 2000.

---

Jodi Kathryn Rowe, Marion County Public Defender Agency, Indianapolis, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Liisi Brien, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

ROBB, Judge

Terry Pennycuff was found guilty by a jury of one count of child molesting, a Class D felony; two counts of child molesting, a Class C felony; one count of sexual misconduct with a minor, a Class C felony; and two counts of incest, a Class B felony. The trial court sentenced Pennycuff to twelve years, with two years suspended. We reverse, and remand for a new trial.

*Issues*

Pennycuff raises several issues for our review, which we consolidate and restate as:

1. Whether the admission of Pennycuff's post-Miranda silence at trial constituted fundamental error;

2. Whether Pennycuff was denied the effective assistance of trial counsel; and

3. Whether the trial court erred in tendering the reasonable doubt instructions to the jury.[1]

*Facts and Procedural History*

The facts most favorable to the verdict reveal that between 1993 and 1996, Pennycuff repeatedly had sexual contact with his biological daughter, T.P. Pennycuff's sexual relationship with T.P. began in May of 1993, when he paid her twenty dollars to view her vagina. At that time, T.P. was only thirteen years old. Pennycuff's sexual contact with T.P. later escalated to him touching and performing oral sex on T.P. In 1994, Pennycuff began having sexual intercourse with T.P. on a regular basis. Following each episode of sexual contact, Pennycuff either paid T.P. money, took her to dinner, or purchased new clothes for her. On June 1, 1996, after Pennycuff told T.P. that he thought his fiancée's young daughter was attractive, T.P. confided in her mother about the sexual contact with Pennycuff.

Consequently, the State charged Pennycuff with one count of child molesting as a Class D felony, two counts of child molesting as Class C felonies, two counts of sexual misconduct with a minor and two counts of incest. The trial court dismissed one count of sexual misconduct with a minor prior to trial. A jury later found Pennycuff guilty of all the remaining counts. The trial court sentenced Pennycuff to twelve years at the Indiana Depart-

---

1. Because we have reversed Pennycuff's convictions and remanded for a new trial on the basis that he received the ineffective assis- tance of trial counsel, we need not address this issue.

ment of Correction, with two years suspended. Thereafter, Pennycuff filed a Motion to Correct Errors, which the court denied on June 25, 1998. This appeal ensued.

### Discussion and Decision
### I. *Doyle* Violation

Using a defendant's post-Miranda silence for impeachment violates the Due Process Clause of the Fourteenth Amendment. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); U.S. Const. amend. XIV. In *Doyle*, the United States Supreme Court noted that Miranda warnings give the criminal defendant implicit assurances that his silence will carry no penalty. *Id.* at 618, 96 S.Ct. 2240. "In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 619, 96 S.Ct. 2240. A *Doyle* violation is actually a violation of the Due Process Clause's prohibition against fundamental unfairness, not a violation of the Fifth Amendment privilege against self-incrimination. *See Wainwright v. Greenfield*, 474 U.S. 284, 291 n. 7, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). Indiana recognizes the rule set out in *Doyle* and does not allow prosecutors to use a defendant's post-Miranda silence as a means of impeachment. *Sylvester v. State*, 698 N.E.2d 1126, 1130 (Ind.1998). However, the use of pre-arrest, pre-Miranda silence is not prohibited. *See Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) (refusing to extend *Doyle* rule to pre-arrest silence).

### A. Fundamental Error

Pennycuff first contends that the trial court committed fundamental error when it allowed the prosecutor to comment on his post-Miranda silence. We disagree.

A fundamental error has been described as a substantial, blatant violation of basic principles of due process rendering the trial unfair to the defendant.

*Baird v. State*, 688 N.E.2d 911, 917 (Ind. 1997), *cert. denied*, 525 U.S. 849, 119 S.Ct. 122, 142 L.Ed.2d 99 (1998); *Collins v. State*, 567 N.E.2d 798, 801 (Ind.1991). The failure to object does not preclude review when such preclusion would deny the defendant "fundamental due process." *Johnson v. State*, 271 Ind. 145, 390 N.E.2d 1005, 1010 (1979), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 312 (1979). A *Doyle* claim may constitute fundamental error. *Wilson v. State*, 514 N.E.2d 282, 284 (Ind.1987). However, the fundamental error doctrine cannot become a ruse to circumvent the necessity of timely objecting to alleged errors at trial. *Cox v. State*, 475 N.E.2d 664, 670 (Ind.1985). The mere fact that an alleged error implicates constitutional issues does not establish that fundamental error has occurred. *Wilson*, 514 N.E.2d at 284.

Accordingly, demonstrating the denial of any specific constitutional right does not alone resurrect a forfeited claim. *Baird*, 688 N.E.2d at 917. *See also Brady v. State*, 575 N.E.2d 981, 987 (Ind.1991) (right to meet witnesses face to face); *Malo v. State*, 266 Ind. 157, 162, 361 N.E.2d 1201, 1204–05 (1977) (alleged improper comment upon Fifth Amendment privilege to remain silent). The Indiana Supreme Court has repeatedly emphasized the narrow applicability of the fundamental error doctrine. *See e.g., Ford v. State*, 704 N.E.2d 457, 461 (Ind.1998) (available only when there are blatant violations of basic and elementary principles of due process, and the harm or potential for harm cannot be denied); *Coleman v. State*, 703 N.E.2d 1022, 1036 (Ind.1998) (applies to only the most blatant denials of elementary due process); *Stevens v. State*, 691 N.E.2d 412, 420 n. 2 (Ind.1997), *cert. denied*, 525 U.S. 1021, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998) ("should be a rare, rather than merely an alternative claim"); *Barany v. State*, 658 N.E.2d 60, 64 (Ind. 1995) (it must be so prejudicial to the

rights of a defendant as to make a fair trial impossible).

■ Pennycuff argues that the trial court committed fundamental error when it permitted the State to repeatedly comment on his post-Miranda silence during the examination of witnesses and closing argument. Our review of the record does not reveal blatant violations of basic and elementary principles of due process nor does it reveal that the claimed harm to Pennycuff was so prejudicial to make a fair trial impossible. Therefore, in the present case, we decline to apply the fundamental error doctrine to resurrect the forfeited *Doyle* violation.

### B. Ineffective Assistance of Trial Counsel

■ Pennycuff also contends that he received the ineffective assistance of trial counsel. Pennycuff raises several claims of ineffective assistance of trial counsel, one of which we find dispositive: whether counsel's performance was deficient in failing to object to the State's references to Pennycuff's post-Miranda silence during the examination of witnesses and closing argument. We agree.

### 1. Standard of Review for Ineffective Assistance of Trial Counsel

■ To establish a violation of the Sixth Amendment right to effective assistance of counsel, Pennycuff must show: (1) that his counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms; and (2) a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Rondon v. State,* 711 N.E.2d 506, 517–18 (Ind.1999). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. More recently, the Supreme Court of the United States held that prejudice resulting from

ineffective assistance of counsel is not established unless the error rendered the result of the proceeding fundamentally unfair or unreliable. *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The two prongs of *Strickland* are separate and independent inquiries; hence "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052.

■ In evaluating counsel's performance, there is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment, and the burden falls on the defendant to overcome the presumption. *Lee v. State,* 694 N.E.2d 719, 720 (Ind.1998), *cert. denied,* 525 U.S. 1023, 119 S.Ct. 554, 142 L.Ed.2d 461 (1998). Isolated poor strategy or bad tactics do not necessarily constitute ineffective assistance of counsel. *Whitener v. State,* 696 N.E.2d 40, 42 (Ind. 1998). A deliberate choice made by an attorney for a tactical or strategic reason does not establish ineffective assistance of counsel even though the choice may be subject to criticism or ultimately proves to be detrimental to the defendant. *Seaton v. State,* 478 N.E.2d 51, 54 (Ind.1985). Thus, the burden of proving counsel's ineffectiveness rests squarely on the shoulders of the claimant. *Allen v. State,* 686 N.E.2d 760, 777 (Ind.1997), *cert. denied,* 525 U.S. 1073, 119 S.Ct. 807, 142 L.Ed.2d 667 (1999).

### 2. A Failure to Object

■ In the present case, the Marion County Sheriff's Office executed a search warrant of Pennycuff's residence after T.P. alleged that Pennycuff had sexually molested her. R. 337. During the execution of the search warrant, Pennycuff was interviewed in the kitchen of his home

by Detective Carmie Godan.[2] R. 195. Prior to questioning, Pennycuff signed an Advice of Rights form,[3] which informed him of his Miranda rights. Thereafter, the following colloquy occurred between Detective Godan and Pennycuff:

Q. [Detective]: Um-huh (indicating yes). Well, also, in there, she says that that book, it has the 49er's on it, that you would write in there different times with different initials when you'd had sex with her.

A. [Pennycuff]: (No verbal response).

Q. No?

A. (Inaudible).

2. We note that the record is unclear when Pennycuff was formally arrested. On June 24, 1996, while the sheriff's office executed a search warrant at his home, he was interviewed by Detective Godan. Prior to the commencement of the interview, Pennycuff signed an Advice of Rights form. The Advice of Rights form informed him of his Miranda rights. A bail hearing for Pennycuff was held the following day. Thus, for purposes of this appeal, we assume that he was arrested when the sheriff's office executed the search warrant at his home. We note that the Miranda warnings are designed to secure the criminal defendant's constitutional right against compulsory self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When an accused is subjected to custodial interrogation, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of the procedural safeguards effective to secure the [defendant's Fifth and Fourteenth Amendment] privilege against self-incrimination." *Id.* at 444, 86 S.Ct. 1602. The Miranda warnings apply only in custodial interrogation because they are meant to overcome the inherently coercive and police-dominated atmosphere of custodial interrogation. *Id.; see also Carter v. State*, 634 N.E.2d 830 (Ind.Ct.App.1994). Interrogation includes both express questioning and words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Curry v. State*, 643 N.E.2d 963, 977 (Ind.Ct.App.1994), *trans. denied*. However, interrogation must involve a measure of compulsion beyond that inherent in custody itself. *Id.* Pennycuff was clearly interrogated by Detective Godan at his residence on

S.R. 208. Although Pennycuff refused to answer Detective Godan's questions regarding the meaning of his initials in his calendar, he was responsive to the majority of the questions posed by Detective Godan.

At trial, the State attempted to impeach Pennycuff's exculpatory testimony by making direct reference to his post-Miranda silence, even though Pennycuff had been advised when questioned that he had a right to remain silent. During the prosecution's cross-examination of Pennycuff at trial, the following exchange occurred:

Q. [State]: Mr. Pennycuff, we talked a lot about the calendar.

A. [Pennycuff]: Yes.

June 24, 1996. In order to be in custody for purposes of Miranda, one need not be placed under formal arrest. *Thompson v. State*, 692 N.E.2d 474, 476 (Ind.Ct.App.1998). Rather, the determination is based upon whether the individual's freedom has been deprived in a significant way or if a reasonable person in the accused's circumstances would believe that he is not free to leave. *Id.; Cliver v. State*, 666 N.E.2d 59, 66 (Ind.1996). The determination involves an examination of all the objective circumstances surrounding the interrogation. *Loving v. State*, 647 N.E.2d 1123, 1125 (Ind.1995). After examining the totality of the circumstances, we also believe that Pennycuff was in custody. Thus, Detective Godan was required to inform Pennycuff of his Miranda rights prior to questioning.

3. The Advice of Rights form provides in pertinent part that:

Before we ask you any questions, you must understand your rights.
1. You have the right to remain silent.
2. Anything you say can be used as evidence against you in court.
3. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
4. If you cannot afford a lawyer and you want one, one will be appointed for you by the court before any questioning.
5. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

S.R. 199.

Q. And the initials that you wrote on the calendar; isn't that correct?

A. Yes.

Q. Detective Godan talked to you and asked you about those initials in the calendar; didn't she?

A. Ah—I don't think she did.

Q. You don't remember her mention a calendar and ask you about those initials?

A. No, they took that stuff and walked out the door with it.

Q. My question is: You do not remember Detective Godan . . .

A. No, I don't.

Q. . . . asking about your initials?

A. No, I don't.

Q. And you don't remember her giving you a chance to explain those initials?

A. No, I don't.

Q. And you don't remember not responding to her at that time?

A. No.

R. 493. On rebuttal, the prosecution questioned Detective Godan about Pennycuff's refusal to answer questions about the meaning of his initials in his calendar:

Q. [State]: Did you ask the Defendant, Terry Pennycuff, about the calendar?

A. [Detective]: Yes, I did.

Q. Did you ask him about the initials?

A. Yes, I did.

Q. And how did he respond?

A. He didn't give me any response.

Q. In fact, did you ask him whether or not—told him that this was his chance to respond?

A. Yes?

Q. To that?

A. Yes, I did.

Q. And he did not.

R. 498–99. The prosecutor also made reference to Pennycuff's post-Miranda silence in closing argument.

Let's talk about the calendar because that's something that's just—it's—you gotta believe [T.P.] or the Defendant. You've got to choose which one you're going to believe. Okay. Who is the more credible witness. I already talked about [T.P.'s] credibility. Untouchable. Unbelievable. You can't get a better witness than that. Now let's talk about the Defendant. Let's talk about what he had time to figure out what those initials stood for. He didn't tell the detective anything about it when he had an opportunity to explain it. He gets up there and he had overnight to think about it because we introduced some of these things.

R. 729. After reviewing the record, we believe that these references made by the prosecutor were impermissible under *Doyle*.

 However, the mere discovery of a *Doyle* violation is not per se grounds for relief. *Doyle* violations are subject to a harmless error review. *Henson v. State*, 514 N.E.2d 1064, 1067 (Ind.1987); *Bieghler v. State*, 481 N.E.2d 78, 92 (Ind.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986). To determine whether a *Doyle* error is harmless, a reviewing court must ask if, absent the prosecutor's allusion to the defendant's post-arrest failure to deny the charged conduct, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict. *Yurina v. State*, 474 N.E.2d 93, 96–97 (Ind. 1985). Essentially, a *Doyle* violation is harmless "only when the court, after assessing the record as a whole to determine the probable impact of the improper evidence on the jury, can conclude beyond a reasonable doubt that the error did not influence the jury's verdict." *Henson*, 514 N.E.2d at 1067. Indiana courts look to the following five factors to determine whether a *Doyle* violation constitutes harmless error: 1) the use to which the prosecution puts the post-arrest silence; 2) who elected to pursue the line of questioning; 3) the quantum of other evidence indicative of

guilt; 4) the intensity and frequency of the reference; and 5) the availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions. *Id.*

First, the State used Pennycuff's post-Miranda silence in three ways: 1) through Pennycuff, to imply that Pennycuff demonstrated his guilt by not answering Detective Godan's questions and denying the allegations; 2) through Detective Godan, to emphasize Pennycuff's failure to respond to incriminating questions; and 3) during closing arguments to bolster the credibility of T.P.'s testimony and raise the presumption of guilt on the part of Pennycuff. We do not believe that the State's repeated references to Pennycuff's post-Miranda silence were inadvertent. The prosecutor deliberately utilized Pennycuff's silence as a means of convincing the jury of his guilt and to influence the jury into believing the testimony of T.P.

Furthermore, the prosecutor commented on Pennycuff's post-Miranda silence with intensity and frequency. The prosecutor posed direct questions to Pennycuff and Detective Godan regarding Pennycuff's refusal to answer questions about the calendar. Moreover, the prosecutor emphasized Pennycuff's post-Miranda silence in closing argument. The State purposely spread the improper comments throughout the trial, effectively prejudicing Pennycuff to the jury.

Next, the quantum of evidence in the present case is not so overwhelming as to render the error harmless.[4] The trial was a credibility judgment; it was the victim's word against Pennycuff. Although T.P. provided detailed testimony regarding the molestation, there was no strong corroborating evidence[5] of Pennycuff's guilt. Convictions for incest and child molesting may rest upon the uncorroborated testimony of the victim. *Baxter v. State*, 522 N.E.2d 362, 365 (Ind.1988). However, evidence that is merely sufficient to sustain a conviction is not so "over-

---

4. All of the evidence the prosecutor introduced at trial was circumstantial, no direct evidence of Pennycuff's guilt was presented by the State. At trial, the prosecutor introduced a sexual device, commonly referred to as a "dildo," into evidence. R. 389. T.P. testified at trial that Pennycuff asked her to use the sexual device in his presence. R. 236. T.P.'s mother testified that she purchased the sexual device for sexual relations with Pennycuff prior to their divorce. Thus, the sexual device cannot be directly linked to the improper sexual contact of Pennycuff with T.P. In addition, T.P. testified at trial that on several occasions Pennycuff videotaped and photographed her while she was nude and performing a sex act. R. 251. However, the police were unable to find the imagery when they searched Pennycuff's residence. T.P. also testified that she wore a black slip on one occasion when Pennycuff photographed her. R. 233. Testimony at trial established that T.P.'s mother had purchased a black slip for her. Thus, the black slip is not overwhelming evidence of Pennycuff's guilt. Furthermore, the police were unable to obtain any tangible physical evidence from T.P.'s person to link Pennycuff with having sexual relations with T.P. Moreover, Nancy Koppel, a psychiatric social worker, testified that T.P. informed her that she had been sexually abused by Penny-

cuff. R. 407. Although Koppel stated that in her opinion T.P. had been sexually abused, her opinion was based solely on T.P.'s statements to her during counseling sessions. R. 407. T.P.'s brother, J.P., testified that Pennycuff often told him to play Sega or watch television so that he could be alone with T.P. in another room of the residence. R. 327. However, J.P. stated that he did not have knowledge that Pennycuff and T.P. were having sexual contact. R. 328. The prosecutor also introduced into evidence at trial a nude celebrity collage and a pornographic magazine, but these items merely highlight Pennycuff's inclination toward pornography. R. 360, 370. We cannot conclude that the quantum of evidence presented at trial was so overwhelming as to render the *Doyle* violation harmless.

5. We note that during the police interview on June 24, 1996, Pennycuff refused to answer questions regarding whether the initials in the calendar were a cryptic means for him to remember the dates he had sexual contact with T.P. At trial, Pennycuff testified that the initials in his calendar had different meanings than when he had sexual contact with T.P. *See* R. 451–57. Thus, the calendar was a crucial evidence for the State that Pennycuff had sexual contact with T.P.

whelming" that it outweighs the harmful effect of the State's inquiry into the defendant's silence. *White v. State*, 647 N.E.2d 684, 688 (Ind.Ct.App.1995). Thus, the quantum of other evidence indicative of Pennycuff's guilt is insufficient to overcome the prejudicial effect of the State's improper references to Pennycuff's post-Miranda silence.

Finally, the trial judge did not have an opportunity to warn the jury of the dangers of this type of questioning, testimony, and closing remarks. Pennycuff's counsel failed to make a timely objection to these impermissible references.

After applying the five factors to the facts of the present case, we hold that the errors arising from the questioning, testimony and the closing argument regarding Pennycuff's post-Miranda silence were not harmless. Because the *Doyle* violation constituted error, Pennycuff was clearly prejudiced by trial counsel's failure to object to the State's repeated reference to his post-Miranda silence during trial. Thus, we conclude that Pennycuff received the ineffective assistance of trial counsel.

## II. Double Jeopardy

 Although not raised on appeal, we will address double jeopardy to determine whether retrial is permissible.

 The federal double jeopardy clause provides that no person will "be subject for the same offence to be twice put in jeopardy of life or limb." [6] *United States v. Dixon*, 509 U.S. 688, 695–96, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993); U.S. Const. amend. V. This prohibition applies to the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). The double jeopardy clause provides three basic protections: 1) it protects against a second prosecution for the same offense after acquittal; 2) it protects

against a second prosecution for the same offense after conviction; and 3) it protects against multiple punishments for the same offense. *State v. Boze*, 482 N.E.2d 276, 278 (Ind.Ct.App.1985). In addition, double jeopardy bars retrial if a conviction is reversed on the basis of insufficient evidence. *Vest v. State*, 621 N.E.2d 1094, 1096–97 (Ind.1993).

 The defense of double jeopardy may not be used "as a sword to prevent the State from completing its prosecution." *Redman v. State*, 679 N.E.2d 927, 930 (Ind.Ct.App.1997), *trans. denied*. Moreover, the United States Supreme Court has recognized that double jeopardy protects a criminal defendant against a retrial "only if there has been some event, such as an acquittal, that terminates the original jeopardy." *Richardson v. United States*, 468 U.S. 317, 325, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984). Indeed, once a court has vacated the conviction of an accused to grant a new trial, that person is placed in a position as if he had never been tried upon that charge at all. *See Causey v. State*, 256 Ind. 19, 22, 266 N.E.2d 795, 797 (1971). In such situations, retrial is permissible. *See Hastings v. State*, 560 N.E.2d 664, 670 (Ind.Ct.App.1990), *trans. denied*. Because Pennycuff's convictions were reversed on the basis that he received the ineffective assistance of trial counsel, the State may try Pennycuff a second time.

## *Conclusion*

Based on the foregoing, we hold that the admission of Pennycuff's post-Miranda silence did not constitute fundamental error but that Pennycuff received the ineffective assistance of counsel when counsel failed to object to the State's repeated references to Pennycuff's post-Miranda silence at trial. In addition, we hold that double jeopardy does not bar the State's retrial of Pennycuff. Therefore, the judgment of

**6.** Article 1, section 14 of the Indiana Constitution provides, "No person shall be put in jeopardy twice for the same offense." This constitutional provision has been interpreted as prohibiting successive prosecutions and multiple punishments for the same offense. *Schrefler v. State*, 660 N.E.2d 585, 587 (Ind. Ct.App.1996).

convictions is reversed and the case is remanded for a new trial.

Reversed and remanded.

BROOK, J., and NAJAM, J., concur.